[redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| INNOVATION SCIENCES, LLC<br><br>v.<br><br>HTC CORPORATION | §<br>§<br>§<br>§<br>§<br>§ | Case No.: 4:18-cv-00476 ALM<br>***Consolidated Lead Case*** |
| INNOVATION SCIENCES, LLC<br><br>v.<br><br>HTC CORPORATION | §<br>§<br>§<br>§<br>§<br>§ | Case No.: 4:19-cv-00752 ALM<br>***Member Case*** |
| HTC CORPORATION<br><br>v.<br><br>INNOVATION SCIENCES, LLC | §<br>§<br>§<br>§<br>§<br>§ | Case No.: 4:20-cv-00180 ALM<br>***Member Case*** |

**HTC CORPORATION'S OPPOSITION TO INNOVATION SCIENCES, LLC'S MOTION FOR SUMMARY JUDGMENT THAT IT OWNS THE PATENTS-IN-SUIT AND HAS THE RIGHT TO SUE**

[redacted]

## TABLE OF CONTENTS


I. RESPONSE TO IS' STATEMENT OF ISSUES .... 4

II. RESPONSE TO IS' STATEMENT OF UNDISPUTED MATERIAL FACTS .... 5

III. LEGAL STANDARD .... 7

IV. HTC MAY CHALLENGE IS' LEGAL TITLE IN THE ASSERTED PATENTS .... 8

V. INNOVATION SCIENCES DOES NOT HAVE STANDING TO BRING SUIT .... 8

- A. Disputes of Material Fact Whether IS Acquired Title to the '798, '918, or '983 Patent .. 10
- B. Disputes of Material Fact as to Whether Any Consideration Was Exchanged for the Assignment of Rights to the Asserted Patents .... 12

VI. RFMD BECAME AT LEAST A CO-OWNER OF THE ASSERTED PATENTS .... 15

- A. Ronald Assigned to RFMD his Rights to Inventions that became Incorporated in the Asserted Patents .... 16
- B. Ronald's Assignment to RFMD is Enforceable under California Law .... 18
  - 1. The Assigned Inventions were Developed using RFMD's Time or Resources .... 19
  - 2. The Inventions Relate to RFMD's Business or Actual or Demonstrably Anticipated Research or Development .... 22
- C. SellerBid was not a Bona Fide Purchaser for Value under 35 U.S.C. § 261 .... 26

VII. DISPUTES OF MATERIAL FACT WHETHER SELLERBID TECHNOLOGY LTD. AND/OR CHINA ENTROPY ARE CO-OWNERS OF THE ASSERTED PATENTS .... 28

VIII. CONCLUSION .... 30

[redacted]

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraxis Biosciences, Inc. v. Navinta LLC*,
625 F.3d 1359 (Fed. Cir. 2010)....................8

*Anderson v. Liberty Lobby Inc.*,
477 U.S. 242 (1986)....................7

*Aspex Eyewear, Inc. v. Miracle Optics, Inc.*,
434 F.3d 1336 (Fed. Cir. 2006)....................8

*Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys. Inc.*,
583 F.3d. 832 (Fed. Cir. 2009)....................16, 26

*Cadence Design Sys., Inc. v. Bhandari*,
No. C-07-00823, 2007 WL 3343085 (N.D. Cal. Nov. 8, 2007) ....................18, 19, 21, 22

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................7

*D & N Bank v. United States*,
331 F.3d 1374 (Fed. Cir. 2003)....................15

*ESN, LLC v. Cisco Sys., Inc.*,
685 F. Supp. 2d 631 (E.D. Tex. 2009)....................8

*Farmers Edge Inc. v. Farmobile, LLC*,
No. 8:16-cv-191, 2018 WL 2869003 (D. Neb. May 3, 2018) ....................11

*Filmtec Corp. v. Allied-Signal Inc.*,
939 F.2d 1568 (Fed. Cir. 1991)....................8, 26, 27

*Fisk Elec. Co. v. DQSI, L.L.C.*,
894 F.3d 645 (5th Cir. 2018) ....................7

*Gellman v. Telular Corp.*,
No. 2:07-cv-282, 2010 WL 5173213 (E.D. Tex. Dec. 14, 2010) ....................11

*GunVault, Inc. v. Wintrode Enterprises, Inc.*,
No. ED CV12-01459, 2014 WL12589336 (C.D. Cal. Feb. 24, 2014) ....................10

*Huawei Techs. Co., Ltd. v. Yiren Huang*,
No. 4:17-CV-00893, 2019 WL 1978339 (E.D. Tex. May 5, 2019)....................17

[redacted]

*Iconix, Inc. v. Tokuda*,
457 F. Supp. 2d 969 (N.D. Cal. 2006) ....................4, 18, 19, 21

*Intellectual Ventures I LLC v. Erie Indemnity Co.*,
850 F.3d 1315 (Fed. Cir. 2017)....................17

*Israel Bio-Eng'g Project v. Amgen, Inc.*,
475 F.3d 1256 (Fed. Cir. 2007)....................15

*Little v. Liquid Air Corp.*,
37 F.3d 1069 (5th Cir. 1994) ....................7

*Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*,
925 F.3d 1225 (Fed. Cir. 2019)....................15

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................3, 4, 8, 22

*Martex Biosciences Corp. v. Nutrinova, Inc.*,
579 F.3d 1363 1376 (Fed. Cir. 2009)....................11

*MHL Tek, LLC v. Nissan Motor Co.*,
655 F.3d 1266 (Fed. Cir. 2011)....................8

*Reid v. General Motors Corp.*,
489 F. Supp. 2d 614 (E.D. Tex. 2007) ....................8

*Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*,
402 F.3d 1198 (Fed. Cir. 2005)....................8

*STC.UNM v. Intel Corp.*,
754 F.3d 940 (Fed. Cir. 2014)....................7, 15

*Virginia Innovation Sciences Inc. v. Amazon.com, Inc.*,
227 F. Supp. 3d 582 (E.D. Va. Jan. 5, 2017), *aff'd*, 718 F. App'x 988 (Fed. Cir. 2018) ....................5

*Warren v. Fed. Nat'l Mortg. Ass'n*,
932 F.3d 378 (5th Cir. 2019) ....................7

**Statutes**

28 U.S.C. § 1359....................14

35 U.S.C. § 101....................5

35 U.S.C. § 133....................11

35 U.S.C § 261.................... *passim*

[redacted]

35 U.S.C. § 262 ........................................................................................................30

California Labor Code § 2870 ........................................................................................ *passim*

California Labor Code § 2872 ..............................................................................................4

**Other Authorities**

37 C.F.R. § 1.135 .....................................................................................................11

37 C.F.R. § 3.28 .......................................................................................................10

FED. R. CIV. P. 56(a) ..................................................................................................7

FED. R. CIV. P. 56(c)(1)(A) ...........................................................................................7

MPEP § 302.07 ........................................................................................................10

[redacted]

Innovation Sciences, LLC ("IS") seeks summary judgment that "it owns all right, title and interest" in the patents-in-suit, but cannot meet the evidentiary threshold required for summary judgment. There are genuine issues of material fact as to whether IS even owns ***any*** legal interest in the patents-in-suit, let alone ***all*** rights and interests that are required for IS to maintain this suit absent joinder of other co-owners.

In filing its motion, IS acknowledges that HTC and Resideo's motion for summary judgment filed months ago (4:18-cv-474, Dkt. No. 441) does not turn on any genuine dispute of material fact. That motion ("HTC/Resideo MSJ")—which is premised on whether Dr. Ronald Wang ("Ronald") assigned his inventions to his then-employer, RFMD—is a "dispute [that] is limited to the legal consequence" of "material facts [that] are not in dispute." Mot. at 1. For the reasons set forth in the HTC/Resideo MSJ, IS is ***at most*** a co-owner of the Asserted Patents because Ronald assigned his inventions to RFMD.

The evidence in support of the HTC/Resideo MSJ is compelling. Indeed, IS brought an investigation before the International Trade Commission where the same arguments and material facts surrounding the issue of co-ownership issue have been presented. On June 12, 2020, the Office of Unfair Import Investigations ("OUII")[1] issued its pre-hearing brief, advocating that:

> The Staff expects the evidence to show that RFMD is a co-owner of the Asserted Patents because Dr. Ronald Wang assigned his rights in the Asserted Patents to RFMD as a result of (i) an "Inventions, Confidentiality and Non-Solicitation Agreement" ("RFMD Agreement") that is enforceable; and (ii) the inventions of

---

[1] The United States International Trade Commission's website states that "The Office of Unfair Import Investigations (OUII) participates as a full party representing the public interest in adjudicatory investigations conducted under section 337 of the Tariff Act of 1930." The second stated function is to "[p]erform[] substantive litigation activities as an independent party representing the public interest in section 337 investigations by developing relevant information and advocating on behalf of the public an independent position on the issues so that the Commission and its Administrative Law Judges can discharge the statutory decision-making responsibilities in such investigations." *See* https://www.usitc.gov/offices/ouii.

[redacted]

> the Asserted Patents are Inventions under the RFMD Agreement; and (iii) the inventions developed by Dr. Ronald Wang relate to RFMD's business.

Ex. 1 at 24-26 (Excerpts from OUII brief).

While the fact-finder in this case will make its own determination, HTC respectfully submits that the findings of an independent government office representing the public interest indicates that IS cannot meet its burden in the present Motion.[2]

There are no genuine disputes of material fact as to whether Ronald assigned to RFMD rights in the Asserted Patents as a result of his employment agreement ("RFMD Agreement"). Nor are there genuine disputes of material fact that IS's predecessor, SellerBid, Inc., was on notice of the RFMD Agreement. Ronald is a co-founder of SellerBid and was instrumental in developing its patent portfolio. Dr. Anne Wong ("Anne"), the CEO and other co-founder of SellerBid, had access to Ronald's RFMD job application, which provided [redacted] *See* Ex. 2 at 9 (RFMD Job Application). These undisputed facts alone defeat IS's BFP Defense, which is why granting the HTC/Resideo MSJ would be proper.

The same cannot be said for IS's Motion, though. As explained below, there are clear disputes of material fact as to IS's contention that SellerBid was a "subsequent purchaser … for a valuable consideration."[3]

---

[2] Moreover, IS appears to acknowledge that underlying factual issues exist with respect to its claim that SellerBid was a purchaser "for a valuable consideration" under its bona fide purchaser defense ("BFP Defense"). 4:18-cv-474, Dkt. No. 719. In the related actions against Amazon and Resideo, IS has sought leave to file the same substantive motion and argues that "[t]o the extent there are any underlying factual issues, those issues are so clearly in Innovation's favor that they should not be presented to the jury for consideration." *Id.* at 2. They clearly are not. *See infra* Section VI.C.

[3] In IS's sur-reply to the HTC/Resideo MSJ, IS improperly introduced for the first time evidence previously withheld in discovery purporting to support its argument that SellerBid purchased Ronald's rights in certain patent applications for "valuable consideration." 4:18-cv-474, Dkt.

[redacted]

Moreover, the conclusion that IS asks the Court to reach on summary judgment – that "it owns all right, title and interest" in the Asserted Patents, goes well beyond the arguments and evidence presented in IS's Motion. IS's Motion is directed to whether RFMD is a co-owner of the Asserted Patents as a result of Ronald's RFMD Agreement—rehashing the same but limited issue already presented to the Court in the HTC/Resideo MSJ. While deciding that issue in HTC's favor would end this case (because all co-owners must be joined), deciding it in IS's favor does not mean it "owns all right, title and interest."

Discovery in these consolidated actions has just begun, but discovery from the first case already revealed that there are genuine disputes of material fact as to whether IS owns ***any*** legal interests in the Asserted Patents (such that it does not even have standing) and whether other entities beyond RFMD have ownership rights, as well. Contrary to IS' representations, this Court's Order on November 18, 2019 did not conclude that IS has standing in this lawsuit. Mot. at 1, n.1 ("This Court previously found that Innovation has constitutional standing"). Rather, this Court held that IS met its burden to plead constitutional standing to survive a motion to dismiss. 4:18-cv-00474, Dkt. 314 at 4 ("At the pleadings stage, general factual allegations of injury resulting from the defendant's conduct may suffice"). But proving the elements of constitutional standing "are not mere pleading requirements" and IS "can no longer rest on such mere allegations." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Nor can IS' allegations replace its burden at summary judgment to show that there are no genuine disputes of material fact as to whether "it owns all right, title and interest" in the Asserted Patents. IS's Motion should be denied.

---

No. 654 at 7 (Anne Wong Declaration and Exhibits 31-35). Resideo and HTC have moved to strike this evidence and for discovery sanctions. 4:18-cv-474, Dkt. No. 721. IS continues to withhold financial records that are relevant to this issue and preclude HTC from a full and fair opportunity to test the veracity of this evidence.

[redacted]

## I. RESPONSE TO IS' STATEMENT OF ISSUES

1. IS does not own any interest in U.S. Patent Nos. 9,912,983 ("the '983 patent), 9,942,798 ("the '798 patent"), 9,729,918 ("the '918 patent), and 10,104,425 ("the '425 patent) (collectively, "the Asserted Patents"). IS therefore does not have the right to bring suit for patent infringement. At most, IS is a co-owner of the Asserted Patents and cannot unilaterally sue absent joinder of necessary parties to this litigation.

2. IS does not have standing to bring suit for infringement of the Asserted Patents.

3. HTC argues that third parties hold legal title to the Asserted Patents. As result, IS cannot maintain these cases absent joinder of these third parties.

4. IS bears the burden of proof that it owns the Asserted Patents. *Lujan*, 504 U.S. at 561. With respect to Ronald's assignment to RFMD, "the burden of proof shall be on the [party] claiming the benefits" of California Labor Code § 2870. Cal. Labor Code § 2872.

5. Under the RFMD Agreement, Ronald assigned to RFMD all inventions he [redacted] during his employment, even if those inventions did not relate to RFMD's business or result from Ronald's work for RFMD.

6. Ronald "developed" inventions disclosed in the Asserted Patents using RFMD time and resources. *See, e.g.*, Ex. 3 (January 2007 emails with invention notes).

7. The RFMD Agreement is not against California public policy, [redacted] The scope of the RFMD Agreement is therefore coextensive with the scope of § 2870, which provides the standard for the public policy of California on invention assignment issues. *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 992 (N.D. Cal. 2006).

8. SellerBid was not a bona fide purchaser for value under 35 U.S.C § 261 because SellerBid had actual or inquiry notice of the RFMD Agreement. Nor did SellerBid purchase Ronald's interest in his inventions for "a valuable consideration."

[redacted]

## II. RESPONSE TO IS' STATEMENT OF UNDISPUTED MATERIAL FACTS

A. HTC asserts that third parties not presently joined in this litigation hold legal title to the Asserted Patents. *See, e.g.*, Dkt. 441 at 15.

B. On his job application to RFMD, Ronald disclosed one patent for which he is a named inventor: U.S. Patent No. 6,618,705 ("the '705 patent"). Ex. 2 at 8. That patent is unrelated to the Asserted Patents. On his job application to RFMD, Ronald also disclosed one provisional patent application for which he is a named inventor: U.S. Provisional Application No. 60/588,358 ("the '358 application"). *Id.* That application led to a family of patents that were found invalid under 35 U.S.C. § 101 in related litigation. *Virginia Innovation Sciences Inc. v. Amazon.com, Inc.*, 227 F. Supp. 3d 582 (E.D. Va. Jan. 5, 2017), *aff'd*, 718 F. App'x 988 (Fed. Cir. 2018). [redacted] Mot. at 3. Neither are relevant to the present Motion.

Ronald began his employment on or around [redacted]. Ex. 4 at 1 (RFMD Employment Record). By this date, in addition to the '705 patent and '358 application, Ronald was a named inventor for U.S. Application 11/165,341 ("the '341 application"), and U.S. Provisional Application Nos. 60/707,561 ("the '561 application") and 60/722,444 ("the '444 application"). Ronald did not disclose the '341, '561, or '444 applications on his job application to RFMD. Ex. 2 at 8. There is no evidence that Ronald discussed the '341, '561, or '444 applications during his RFMD job interview. There is no evidence that Ronald disclosed the '341, '561, or '444 applications before commencing his employment at RFMD.

C. During Ronald's employment, RFMD manufactured integrated circuits (i.e., "microchips") for use in wireless communication devices and systems. *See* Ex. 5 (RFMD 2006 10-K).

[redacted]

D. Ronald co-founded SellerBid in August 2005. Ex. 6 at ¶ 10 (Decl. of Anne Wong, May 23, 2019). During Ronald's employment at RFMD, Ronald purportedly contributed to several inventions in SellerBid's patent portfolio, Ex. 7 (July 21, 2006 email), and led SellerBid's business development efforts in China. Ex. 8 at 1 (May 9, 2008 email).

During Ronald's employment at RFMD, SellerBid filed six patent applications in the U.S. Patent and Trademark Office ("USPTO"), five of which list Ronald as an inventor:

| U.S. Application | Filing Date |
|---|---|
| **60/787,510** | March 30, 2006 |
| **60/832,962** | July 25, 2006 |
| **11/501,747** | August 10, 2006 |
| **11/540,637** | October 2, 2006 |
| **60/899,037** | February 2, 2007 |
| **11/802,418** | May 22, 2007 |

Provisional Application No. 60/899,037 ("the '037 application") lists as inventors Ronald's sister and wife: Tiehong Wang ("Anne") and Ning Wang ("Ning"). Ex. 9 at 1 ('037 application). Notwithstanding the omission of Ronald's name from the '037 application, the evidence suggests that Ronald helped develop the inventions disclosed in the '037 application. Ex. 3. HTC disputes that the named inventors of the foregoing U.S. patent applications assigned to SellerBid their rights to the inventions disclosed in these patent applications.

E. Ronald and SellerBid entered into contracts purporting to assign SellerBid his rights in U.S. Application Nos. 11/501,747 ("the '747 application"), 11/540,637 ("the '637 application"), 11/802,418 ("the '418 application"), and 11/165,341 ("the '341 application") (collectively, "parent-patent applications"). The contracts recited that Ronald assigned his rights in return for "good and valuable consideration, the receipt of which is hereby acknowledge." Ex. 10 at 2-23 (USPTO Assignments). There are genuine disputes of material fact as to whether

[redacted]

Ronald received "good and valuable consideration" for these assignments. The evidence shows that any payment Ronald received from SellerBid, Virginia Innovation Sciences, Inc. ("VIS"), or IS was unrelated to his purported assignment of rights in these parent-patent applications.

F. Ronald assigned to RFMD at least his right to inventions disclosed in Provisional Application Nos. 60/787,510 ("the '510 application"), 60/832,962 ("the '962 application"), and the '037 application, and to the '747, '637, and '418 non-provisional applications.

## III. LEGAL STANDARD

In the Fifth Circuit, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Warren v. Fed. Nat'l Mortg. Ass'n*, 932 F.3d 378, 382 (5th Cir. 2019); FED. R. CIV. P. 56(a). A fact is "material" if it would affect the outcome of the case, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 382-83. *See also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Evidence at the summary judgment stage must be viewed in the light most favorable to the non-moving party, and reasonable inferences must be drawn in the non-moving party's favor. *Fisk Elec. Co. v. DQSI, L.L.C.*, 894 F.3d 645, 650 (5th Cir. 2018). The party seeking summary judgment bears the burden of identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party does not meet its burden by "conclusory allegations" or by "unsubstantiated assertions." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[redacted]

## IV. HTC MAY CHALLENGE IS' LEGAL TITLE IN THE ASSERTED PATENTS

It is well-settled that parties may challenge a patentee's legal title in asserted patents by identifying third parties holding such title. *See, e.g.*, *STC.UNM v. Intel Corp.*, 754 F.3d 940 (Fed. Cir. 2014) (affirming defendant-appellee argument that third-party was a co-owner of the patents-in-suit); *MHL Tek, LLC v. Nissan Motor Co.*, 655 F.3d 1266 (Fed. Cir. 2011) (holding that third-party assignee held legal title to the asserted patents); *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1512 (Fed. Cir. 1991) (describing how defendant-appellant "could defend by arguing that title to the patent was in a third party"); *Reid v. General Motors Corp.*, 489 F. Supp. 2d 614, 616-18 (E.D. Tex. 2007) (ruling in favor of defendant because "a third party is the true owner of the asserted patent" after inventor assigned interest under employment agreement). HTC's defense is not novel, and IS' argument that HTC "lacks prudential standing" should be rejected. *See also* Dkt. 604 at 2-3.

## V. INNOVATION SCIENCES DOES NOT HAVE STANDING TO BRING SUIT

The party invoking federal jurisdiction bears the burden of establishing that it has standing to sue. *Lujan*, 504 U.S. at 561. This burden must be supported "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* While "general factual allegations of injury" may suffice at the pleading stage, on a motion for summary judgment, a party invoking federal jurisdiction must set forth specific factual evidence to support its case. *Id.*

To establish standing in a patent infringement action, the plaintiff must demonstrate that it held enforceable title to the asserted patent at the inception of the lawsuit. *See, e.g.*, *Abraxis Biosciences, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010); *ESN, LLC v. Cisco Sys., Inc.*, 685 F. Supp. 2d 631, 639 (E.D. Tex. 2009). The action must be dismissed if plaintiff lacked Article III standing at the inception of the lawsuit, and the jurisdictional defect cannot be cured

[redacted]

by the addition of a party nor by the subsequent purchase of an interest in the asserted patent. *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1203 (Fed. Cir. 2005).

"Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing." 35 U.S.C. § 261. When a patentee transfers title by assignment, the assignee has standing to sue for infringement in its own name. *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1340 (Fed. Cir. 2006). Here, IS contends that it owns the '798, '918, and '983 patents by virtue of two separate, but related, transfers. Ex. 11 at 7-9 (IS Response to HTC Rog No. 4). The first transfer relied on by IS constitutes a purported assignment executed on May 10, 2017 by and between Anne, Ronald, and VIS ("the May 2017 assignment"). IS maintains that under the terms of this assignment, VIS acquired ownership of "all right, title, and interest" in U.S. Application No. 13,833,328 ("the '328 application") and the '798, '918, and '983 patents. *Id.* at 8 (citing to reel/frame no. 042336/0471). The second transfer IS relies on is its merger with VIS on November 9, 2018 ("the 2018 merger"). *Id.* at 9.

IS also contends that it is the "sole owner" of the '425 patent by alleging that "Certified Assignment documents" evidence its right, title, and interest in this patent. Mot. at 1; Ex. 12 at ¶ 17 (ITC Complaint). These include contracts signed between SellerBid and the inventors of parent-patent applications to the '425 patent ("inventor-assignors"). Ex. 10 at 1-22.

IS' chain-of-title suffers at least two defects: (1) VIS never acquired legal title in the '798, '918, or '983 patents by virtue of the May 2017 assignment; and (2) the purported assignments fail for lack of consideration. Consequently, neither the May 2017 assignment nor the series of purported assignments of parent-patent applications transferred anything to SellerBid and/or VIS. VIS therefore could not transfer any interest in the Asserted Patents to IS

[redacted]

under the November 2018 merger. It follows that IS did not hold enforceable title to the Asserted Patents at the inception of this lawsuit.

### A. Disputes of Material Fact Whether IS Acquired Title to the ’798, ’918, or ’983 Patent

IS represents in an interrogatory response on the issue of standing that VIS was the owner of the ’798, ’918, and ’983 patents by virtue of the May 2017 assignment, recorded at reel/frame no. 042336/0471. Ex. 11 at 8. But reel/frame no. 042336/0471 does not support IS’s contention.

The Asserted Patents issued from the following patent applications:

| Patent | U.S. Application | Filing Date |
|---|---|---|
| ’798 | 15/070,439 | March 15, 2016 |
| ’918 | 15/417,111 | January 26, 2017 |
| ’983 | 15/626,192 | June 19, 2017 |
| ’425 | 15/890,411 | February 7, 2018 |

The evidence identified in its interrogatory response only references U.S. Application No. 15/417,111 (“the ’111 application”). Ex. 13 (reel/frame no. 042336/0471). It makes no mention of U.S. Application Nos. 15/070,439 (“the ’439 application”) or 15/626,192 (“the ’192 application”), which issued as the ’798 and ’983 patents, respectively. *Id.*

Moreover, while the Cover Sheet to the May 2017 assignment references the ’111 application, the actual recorded assignment does not identify this property interest. Instead, the assignment purports to transfer rights in the ’328 application. Ex. 13 at 2-3. Listing the ’111 application on the Cover Sheet does not constitute a recorded assignment of the ’111 application. *See* 35 U.S.C. § 261; *GunVault, Inc. v. Wintrode Enterprises, Inc.*, No. ED CV12-01459, 2014 WL12589336 at *6 (C.D. Cal. Feb. 24, 2014) (“[A]lthough the cover sheet . . . states that it accompanies the assignments of both patents, the ’337 Patent is not mentioned in the recorded assignment itself”). Listing the ’111 application on the Cover Sheet therefore cannot constitute

[redacted]

evidence of IS' standing in this litigation. *See* MPEP § 302.07 (PTO-1595) ("Each ***assignment document*** submitted to the Office for recording must be accompanied by a cover sheet as required by 37 C.F.R. § 3.28.") (emphasis added). Here, the '328 application – and not the '111 application – was the "assignment document submitted to the Office for recording." IS has still not produced evidence of a valid assignment of either the '111, '439, or '192 applications.

IS may contend that assignment of the '328 application constituted assignment of the '111, '439, and '192 applications because they are continuations of the '328 application. *See* Ex. 13 at 2 (assigning right, title and interest in "continuations thereof"). But the USPTO mailed a Notice of Abandonment on July 11, 2016, indicating that the '328 application was abandoned because of "[a]pplicant's failure to timely file a proper reply." Ex. 14 at 13 (file history of '328 application). *See also* 35 U.S.C. § 133; 37 C.F.R. § 1.135. As applicants, Anne and Ronald disclaimed ownership of the '328 application upon its abandonment. *Farmers Edge Inc. v. Farmobile, LLC*, No. 8:16-cv-191, 2018 WL 2869003, at *17 (D. Neb. May 3, 2018) (applicant of abandoned patent application "has no inventive rights to assign"). Indeed, an abandoned application "is inoperative for any purpose, save as evidence of conception." *Martex Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363 1376 (Fed. Cir. 2009) (citing *In re Costello*, 717 F.2d 1346, 1350 (Fed. Cir. 1983)). The May 2017 assignment therefore did not transfer any rights in the '328 application – or its "continuations thereof" – to VIS. *Gellman v. Telular Corp.*, No. 2:07-cv-282, 2010 WL 5173213, at *5 (E.D. Tex. Dec. 14, 2010) (plaintiff did not establish "ownership by assignment" with an assignment of an abandoned application).

Mere allegations no longer suffice, and IS's Motion fails to present undisputed evidence that VIS acquired rights in the applications that issued as the Asserted Patents. Simply put, IS has not set forth specific facts to evidence its legal interest in the'798, '918, or '983 patent.

[redacted]

**B. <u>Disputes of Material Fact as to Whether Any Consideration Was Exchanged for the Assignment of Rights to the Asserted Patents</u>**

IS asserts the ’425 patent in the related ITC proceeding against HTC and Resideo. There, in its Complaint, IS relies on a series of purported assignments between SellerBid and the inventor-assignors of the parent-patent applications. Ex. 12 at ¶ 17; Ex. 10. IS may similarly rely on these assignments for evidencing its legal interest in the ’798, ’918, and ’983 patents. But the documents signed by and between SellerBid and the inventor-assignors fail for lack of consideration—without consideration, the documents did not transfer anything to SellerBid. Consequently, VIS could not have transferred any interest in the Asserted Patents to IS.

The “Certified Assignment documents” purport to transfer rights to SellerBid in the following patent applications (“the parent-patent applications”):[4]

| Patent Application | Date of Purported Assignment |
|---|---|
| 11/540,637 | November 9, 2006 |
| 11/501,747 | August 4, 2009 |
| 11/802,418 | December 22, 2010 |
| 11/165,341 | January 10, 2011 |

Each of the purported assignments recites that the inventor-assignor (i.e., “INVENTOR”) “has sold, assigned, and transferred and does hereby sell, assign, and transfer” to SellerBid all right, title, and interest in “all inventions and improvements” disclosed in the parent-patent application. Ex. 10 at 1-22. In return, the contract recites that SellerBid (“ASSIGNEE”) transfers “good and valuable consideration, the receipt of which is hereby acknowledged.” *Id.*

The agreements contemplated the present-transfer and receipt of consideration. But IS has not set forth any evidence proving that “good and valuable consideration” was actually transferred from SellerBid to the inventor-assignors. To the contrary, [redacted]

[4] The Table does not include assignment of U.S. Application No. 13/075,782. HTC believes that IS included this purported assignment in error.

[redacted]

[redacted] Ex. 15 [redacted]); Ex. 16 [redacted]. [redacted] Ex. 17 a[redacted]

In the context of IS's BFP Defense and with respect to Ronald's purported assignment in the parent-patent applications, IS has argued that SellerBid effectuated valid assignments with him based on a separate, alleged oral agreement to transfer later-earned licensing revenue. Mot. at 3; Ex. 18 [redacted] To support this argument, IS submitted four payments purporting to evidence "[m]onies paid by Innovation or its predecessors in interest" to Ronald. Mot. at 3; Ex. 19 at ¶ 7 (A. Wong declaration, April 16, 2020). These payments include:

1. August 3, 2011 check [redacted]
2. November 8, 2011 check [redacted]
3. April 16, 2012 check [redacted]
4. August 31, 2016 check [redacted]

*Id.* But even this evidence introduces more questions than answers, and on its face does not show consideration for Ronald's assignment of rights in the parent-patent applications.

First, to the extent Ronald actually received any of the above checks, none of them indicate their purpose, let alone the purpose that IS now asserts by way of Anne's declaration. In fact, the [redacted] and [redacted] checks on August 3, 2011 and November 8, 2011, respectively, were issued by Virginia E-Commerce Solutions, LLC ("VECS"). Ex. 20 (VECS Bank Account Statement); Ex. 21 at 2 (Joint Bank Account Statement showing [redacted]

[redacted]

payment). VECS is another Wang-family business, but is a distinct corporate entity from SellerBid, VIS, and IS. VECS never held rights in the parent-patent applications, and never held rights in the Asserted Patents. Rather, VECS owned patents relating to e-commerce, such as U.S. Application No. 09/552,681, which issued as the '705 patent. *See, e.g.*, Ex. 22 (VECS complaint against eBay and non-executed assignment). So, while Ronald might have received [redacted] payments from VECS "for his patent rights," these payments were wholly unrelated to, and cannot constitute consideration for, Ronald's rights in the parent-patent applications. It appears that the best evidence IS can muster contradicts its own arguments and the sworn declaration from its principal.

Next, the [redacted] check from April 16, 2012 was deposited into a joint account held by Ronald, Anne, and their mother, Guiyang Wang ("Guiyang"). Ex. 21. If the bank statements from this joint-account are probative of anything, it is that the deposited funds actually belonged to Anne or Guiyang, and not Ronald. The address listed on the account is [redacted] *Id.* This is where Anne lived, and is where VECS and SellerBid were headquartered. Ex. 23 [redacted] Ex. 24 [redacted] Moreover, the day after VECS transferred [redacted] to this joint account, [redacted] was transferred to a separate account held by Guiyang. Ex. 21 at 2. The transfer also comes 16-months after execution of the last assignment, and 5 ½ years after execution of the first contract. The payment therefore could not constitute a present-transfer of consideration which "was hereby acknowledged" at the execution of the contracts.

The August 31, 2016 check [redacted] suffers from the same infirmities: it was transferred long past the signing of the agreements between SellerBid and Ronald. Furthermore, the account which received this payment was opened in Ronald's name on August 27, 2016, just

[redacted]

four days before transfer. Ex. 25 (Capital One Bank Account Statement). The account was opened under Anne's email address, [redacted] and was listed under [redacted]. *Id.* Anne owns this property. Ex. 26 (Deed and Sales Record); Ex. 27 (February 5, 2018 email). While IS may contend that this check, along with the rest, constitute the consideration paid by SellerBid to Ronald for his assignments, this material fact is in dispute. HTC disputes that this bank statement is credible evidence of consideration under the contracts, sufficient to vest legal title in IS. *Cf.*, 28 U.S.C. § 1359.

In sum, the contracts purporting to assign rights in the parent-patent applications contemplated the present-transfer of consideration. This consideration was not transferred. IS has failed to provide any evidence to the contrary. SellerBid never paid the inventor-assignors for their rights in the '637, '747, '418, or '341 parent-patent applications. The agreements are therefore legally invalid. *D & N Bank v. United States*, 331 F.3d 1374, 1378 (Fed. Cir. 2003) ("The elements to determine that a contract exists are . . . (1) mutuality of intent to contract; (2) consideration; and (3) lack of ambiguity in offer and acceptance."); 17 AM. JUR. 2D CONTRACTS § 105 (2020) ("Consideration is an essential element of, and is necessary to the enforceability or validity, of, a contract. It follows from this rule that a promise not supported by any consideration cannot amount to a contract"). At a minimum, there are genuine disputes of material fact as to whether IS owns any rights to the Asserted Patents as IS has not put forward undisputed evidence in its motion that consideration was exchanged pursuant to the assignments.

## VI. RFMD BECAME AT LEAST A CO-OWNER OF THE ASSERTED PATENTS

Federal Circuit precedent is clear that a plaintiff seeking to maintain an infringement suit must join all co-owners of the patents-in-suit. *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1236 n.7 (Fed. Cir. 2019); *STC.UNM v. Intel Corp.*, 754 F.3d 940, 944-46 (Fed. Cir. 2014) (describing co-owners as "necessary parties who must be joined"). When a

[redacted]

named inventor assigns his or her interest to an employer, the employer holds an undivided interest in the patent. *See* 35 U.S.C. § 261; *Israel Bio-Eng'g Project v. Amgen, Inc.*, 475 F.3d 1256, 1263 (Fed. Cir. 2007). Here, Ronald assigned his undivided ownership interest to RFMD. In 2014, RFMD merged with TriQuint Semiconductor, Inc. to form Qorvo, Inc. ("Qorvo"). Ex. 28 at 3 (Qorvo, Inc. 2014 8-K). Therefore, even if IS holds an "exclusionary right" in the Asserted Patents by virtue of its merger with VIS, it has not yet joined Qorvo as a necessary party to proceed in this lawsuit.[5]

**A. <u>Ronald Assigned to RFMD his Rights to Inventions that became Incorporated in the Asserted Patents</u>**

Ronald began his employment at RFMD [redacted], shortly after founding SellerBid with his sister, Anne. Ex. 4 at 1; Ex.6 at ¶ 10. Upon commencing his employment, Ronald sign an Inventions, Confidentiality and Non-Solicitation Agreement. Ex. 30 ("RFMD Agreement"), providing:

[redacted]

[5] IS argues that, before RFMD merged into Qorvo, RFMD sold its Bluetooth-related intellectual property to Qualcomm. Mot. at 16-17 n.6. IS contends that as consequence of this sale, RFMD transferred to Qualcomm the rights it acquired from Ronald. *Id.* Ronald assigned to RFMD his rights to Inventions disclosed in the '510, '962,'037, '747, '637, and '418 applications. The sale referenced by IS provides for the sale of a specific subset of *Bluetooth* 2.0 Enhanced Data Rate products. Ex. 29 at 27-30 (RFMD 2006 10-Q). It is unclear why IS suggests that Ronald's Inventions attached to this sale.

[redacted]

*Id.* at 2 (emphasis added).[6] Ronald worked for RFMD until [redacted] Ex. 4 at 1. During this time, Ronald and Anne worked together on SellerBid's patent portfolio, developing [redacted] that eventually became incorporated in the Asserted Patents. *See, e.g.*, Ex. 3.

The RFMD Agreement lays out two categories of "Inventions" that an employee is obligated to assign: (1) [redacted] ***or*** (2) [redacted] Ex. 30 at 2. [redacted] *Id.*

IS provides a distorted snippet of the RFMD Agreement, [redacted] Mot. at 7-8. This myopic presentation of the RFMD Agreement, however, contradicts the "clear and explicit" language of the contract when read in its entirety.[7] Contrary to IS' assertion, there is no requirement under the four-corners of the contract that an Invention "relate" to RFMD's business. But as explained below, even if the Court were to accept IS's interpretation of the RFMD Agreement, the evidence shows that the Inventions do relate to RFMD's business.

During his employment at RFMD, Ronald made, conceived, reduced to practice, or learned ideas, developments, improvements, inventions, or know-how that became incorporated

---

[6] The "hereby assign" language in the context of patent rights results in automatic assignment of such rights. *See Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys. Inc.*, 583 F.3d. 832, 842 (Fed. Cir. 2009) (employment agreement language comprising "do hereby assign" effected a present assignment of future inventions).

[7] Under California law, the language of a contract governs if it is "clear and explicit." *Intellectual Ventures I LLC v. Erie Indemnity Co.*, 850 F.3d 1315, 1321 (Fed. Cir. 2017). California contract law governs the RFMD Agreement because it incorporates California Labor Code § 2870 and touches on a "fundamental public policy" of the state. *See Huawei Techs. Co., Ltd. v. Yiren Huang*, No. 4:17-CV-00893, 2019 WL 1978339, at *6-9 (E.D. Tex. May 5, 2019).

[redacted]

in the Asserted Patents. Specifically, during Ronald's employment, SellerBid filed six patent applications in the USPTO, five of which listed Ronald as an inventor. *Supra* Section II.D. [redacted]. *Id.* Ronald also [redacted] the '037 application during his employment at RFMD. Ex. 3. Each of these applications are "incorporated by reference" in the Asserted Patents. *See, e.g.*, '798 patent at col. 1:21-22, 34-35, 45-47. [redacted].

### B. <u>Ronald's Assignment to RFMD is Enforceable under California Law</u>

California Labor Code § 2870 "provides the standard for the public policy of California on issues of invention assignment contracts." *Iconix v. Tokuda*, 457 F. Supp. 2d 969, 992 (N.D. Cal. 2006) (citing Cal. Lab. Code § 2870(b)). § 2870 protects employees by "placing limitations on the types of inventions that he or she can be required to assign to an employer." *Cadence Design Sys., Inc. v. Bhandari*, No. C-07-00823, 2007 WL 3343085 at *5 (N.D. Cal. Nov. 8, 2007). Therefore, if Ronald's assignment to RFMD falls within the scope of § 2870, the assignment is enforceable and aligned with California public policy. *Compare* Mot. at 15.

California Labor Code § 2870 prohibits assignment of an invention that the employee "developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information," ***<u>unless</u>*** (1) the invention "[relates] at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer," ***<u>or</u>*** (2) the invention "[results] from any work performed by the employee for the employer." Therefore, there are three "independent scenarios" where Ronald's assignment under the RFMD Agreement is enforceable:

1. The assigned Invention was developed using RFMD's time ***<u>or</u>*** resources; ***<u>or</u>***

[redacted]

2. The assigned Invention relates to RFMD's business or actual or demonstrably anticipated research or development; ***or***
3. The assigned Invention resulted from work performed by Ronald for RFMD.

*Cadence Design*, 2007 WL 3343085 at *5 n.4 (emphasis added).

IS' reading of the RFMD Agreement and California law—specifically that the Invention must relate to RFMD's business— is incorrect. *See* Mot. at 15-16. Courts applying California law to invention assignment contracts hold that inventions may be assigned to employers regardless of whether those inventions "relate" to the employer's business, so long as they do not fall within the exceptions provided for by § 2870(a). *See Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, at 992 n.4 (N.D. Cal. 2006). While IS might find this result "unfair," Mot. at 13, this is how California courts interpret invention assignment contracts. *See Cadence Design*, 2007 WL 3343085 at *5 n.4 ("Thus, if the invention *was* developed using the employer's time or resources, then the statute does not prohibits assignment and such agreements are enforceable. This is true regardless of whether the invention relates to the business of the employer."). Under California law, the scope of an invention assignment contract is "coextensive" with the scope of § 2870 if that contract "closely tracks the language" of § 2870 and "expressly references the statute." *Id.* at *5 (citing *Iconix, Inc.*, 457 F. Supp. 2d at 992). The RFMD Agreement does just that. Ex. 30 at 2 [redacted]

### 1. The Assigned Inventions were Developed using RFMD's Time or Resources

IS contends that even if Ronald [redacted] the Inventions during his employment, he did not use RFMD time or resources to "*develop*" the Inventions. Mot. at 15 (emphasis in original). The evidence demonstrates otherwise.

To "develop" means "to set forth or make clear by degrees or in detail;" "to work out the possibilities;" "to create or produce especially by deliberate effort over time;" and "to expand by

[redacted]

a process of growth." *Develop*, MERRIAM WEBSTER'S DICTIONARY (last visited June 4, 2020), https://www.merriam-webster.com/dictionary/develop. Ronald used RFMD time and/or resources to "develop" the Inventions disclosed in the Asserted Patents.

First, Ronald used RFMD time to "develop" the Inventions disclosed in the '747 application. On Friday, July 21, 2006, Ronald sent an email [redacted].[8] Ex. 7. In his email, [redacted] *Id.* at 1. A few weeks later, on August 10, 2006, SellerBid filed the '747 application, [redacted] *See* '747 App. at [0030-0056] [redacted]; *id.* at [0057-0074] [redacted]); *id.* at [0075-0093] [redacted] This Invention was eventually incorporated into the Asserted Patents. *See, e.g.*, '983 pat. at col. 6:56 – col. 10:27 [redacted]; *id.* at col. 10:28 – col. 12:32 [redacted]; *id.* at col. 12:32 – col. 14:40 [redacted] By sending this email, Ronald sought "to create . . . by deliberate effort of time" the subject matter disclosed in the '747 application. Indeed, [redacted] Ronald attached to this email was the third version of the document teaching the wireless sensor technology eventually incorporated in the Asserted Patents, and which Ronald removed himself as a named inventor.[9] *Compare* Ex. 31 (November 27 and December 10, 2005 emails with attachments [redacted]) *with* Ex. 7 at 15-17. Ronald's correspondence [redacted] was "to work out the possibilities" of the '747 application. Ex. 7 at 1 [redacted]

Next, Ronald used RFMD resources to "develop" Inventions disclosed in the '037 application. On Tuesday, January 30, 2007, Ronald sent an email at 4:57 pm from [redacted]@rfmd.com [redacted] with the subject line: [redacted] Ex. 3

---

8 [redacted]

9 [redacted]

[redacted]

at 1. Attached to the email was a PDF [redacted] *Id.* The attachment also included [redacted] *Id.* at 2. Anne replied to Ronald's email, [redacted] *Id.* at 6. On Friday, February 2, 2007, Anne filed the '037 application with the same figure and subject matter disclosed in Ronald's email just three-days earlier. *Compare id.* [redacted] *with* Ex. 9 at 11 (Figure) and 4-5 ("Receiving, Converting, and Transmitting;" "Mapping;" "Routing;" "Data Storage"). The Asserted Patents also disclose the subject matter of the attachment [redacted] sent from his [redacted]@rfmd.com email. *See, e.g.*, '983 pat. at Fig. 16. This email evidences Ronald's use of RFMD resources (i.e., email) to "develop" Inventions that were eventually incorporated in the Asserted Patents.

IS was aware of these particular emails demonstrating Ronald's use of RFMD time and/or resources to develop the Inventions, as they were cited in the Reply brief in support of the HTC/Resideo MSJ. To account for the Friday, July 21, 2006 email, IS has argued that Ronald developed these Inventions while on a coffee break, or on vacation:

> Defendants have no evidence that [Ronald] was actually at work during the particular times when those emails were sent. There is no indication whether Dr. Wang was on his lunch break, coffee break or off on vacation when these emails were sent.

Dkt. 654 at 5-6. And with respect to the email sent from [redacted]@rfmd.com, IS contends that the email account does not show that Ronald used RFMD resources to "*develop*" the Inventions. Mot. at 15 (emphasis in original). But the party seeking protection of California Labor Code § 2870 bears the burden to show that the invention comes within the statute. *Cadence Design*, 2007 WL 3343085, at *5; *see also Iconix, Inc.*, 457 F. Supp. 2d at 992 ("Even if 'work time' is not properly circumscribed by the hours of 9:00 a.m. and 5:00 p.m., Tokuda and Shen fail to

[redacted]

convincingly rebut [the Employer's] allegations that they worked on [the Invention] during work hours."). Here, Ronald sent the July 2006 email at [redacted] IS bears the burden to prove that Ronald was "on his lunch break, coffee break or off on vacation" when he sent this email. And this proof cannot rest on "mere allegations." *Lujan*, 504 U.S. at 561. IS must also set forth evidence beyond "mere allegations" that shows how the January 30, 2007 email does not constitute developing the [redacted] behind the '037 application. In that email and corresponding attachment, Ronald "set forth . . . in detail" the Inventions disclosed in the '037 application. MERRIAM-WEBSTER'S DICTIONARY, *supra*. HTC submits that this email and attachment amount to more than "questions or comments relating to prosecution of a patent application." Mot. at 15.

Ronald's correspondence evidence two instances of Ronald using RFMD time and/or resources to develop Inventions. These Inventions were eventually incorporated in the Asserted Patents. Ronald's legal interest in these Inventions were therefore assigned to RFMD.

### 2. The Inventions Relate to RFMD's Business or Actual or Demonstrably Anticipated Research or Development

Even if Ronald developed the Inventions on his own time, and without using RFMD's resources, the Inventions were still assigned to RFMD because they relate to RFMD's business. Courts interpreting employee assignment agreements in the context of § 2870 construe the "related to" phrase broadly. *Cadence Design*, at *5-6. And again, IS bears the burden to show that the invention falls within the protections of § 2870 by proving that it ***does not relate*** to RFMD's business. *Id.* IS cannot make this showing, because the opposite is true.

At the time, RFMD developed integrated circuit technology to enable devices to communicate wirelessly. *See* Ex. 5. RFMD was involved in the wireless communication industries that IS now accuses of infringing the Asserted Patents, such as security systems and cellular telephony. *Id.* at 2. RFMD sought "[t]o be the premier supplier of high-performance

[redacted]

radio systems and solutions – enabling wireless connectivity." Ex. 32 (2006 RFMD Company Info). And as RFMD's website explained: "Essentially, we help the world's communications devices communicate." *Id.* It follows that Inventions improving the "methods and systems for efficient communication," *see* Asserted Patents, were necessarily related to RFMD's business.

When hired, [redacted] *See* Ex. 33 [redacted] Ex. 33 [redacted]; Ex. 34 [redacted]). To do so, RFMD partnered with semiconductor companies to create "reference designs" [redacted]. Ex. 33. [redacted] *See also* Ex. 35 (Press Releases on Reference Designs). [redacted] Ex. 33 [redacted] RFMD thus designed its microchip functionality with the end-user (i.e., the manufacturer of wireless devices) in mind, fully understanding its larger role in the wireless communications marketplace and the "multiple devices" needed for a "smart-home system."

IS' technical expert even admitted [redacted] Ex. 36 [redacted]. [redacted] *Id.* [redacted] Other testimony from IS' technical expert further draws parallels between RFMD's business and the inventions disclosed in the Asserted Patents.

[redacted]

| [redacted] | Statements Regarding RFMD's Business |
|---|---|
| [redacted]<br><br>Ex. 37 [redacted] | RFMD 2008 10K<br><br>"WiFi is used primarily for short-range in home or office network applications"<br><br>Ex. 38 at 3. |
| [redacted]<br><br>*Id.* [redacted] | [redacted]<br><br>Ex. 34 at 2. |
| [redacted]<br><br>*Id.* [redacted] | [redacted]<br><br>Ex. 39 at ¶ 15. |
| [redacted]<br><br>*Id.* [redacted] | [redacted]<br><br>Ex. 34 at 2. |

[redacted]

[redacted]

[redacted]

Ex. 37 [redacted]

IS even concedes that Ronald assigned to RFMD Inventions that have a "relationship to RFMD's business." Mot. at 8. IS finds this relationship to be "superficial," however. *Id.* But it is not true that any two technologies, if abstracted enough, "will appear related." *Id.* Had Ronald reduced to practice an invention for chopping timber, for example, the invention would likely not relate to RFMD's business, no matter the level of abstraction. But that is not what Ronald purportedly assigned. The assigned inventions were direct to enabling multimedia wireless communications. *See, e.g.*, Ex. 40 at 1 ('418 application) ("Method and Apparatus for Multimedia Communications with Different User Terminals"). IS' concession is dispositive. Under the RFMD Agreement, Ronald assigned to RFMD Inventions that "[r]elate to [RFMD's] business or actual or demonstrably anticipated research of [RFMD]." Cal. Lab. Code § 2870(a).

In sum, RFMD was in the business of "help[in]g the world's communications devices communicate," Ex. 32, and the Inventions assigned under the RFMD Agreement were directed to enabling multimedia wireless communications. Ex. 40. While courts construe § 2870's "related

[redacted]

to" clause broadly, this Court need not adopt a broad understanding of RFMD's business or the Inventions that Ronald assigned to his employer. The overlap between Ronald's Inventions and RFMD is readily apparent. Ronald's assignment is not saved by this prong of § 2870.

### C. <u>SellerBid was not a Bona Fide Purchaser for Value under 35 U.S.C. § 261</u>

IS seeks the shelter of 35 U.S.C. § 261 to argue that RFMD is not a co-owner of the Asserted Patents. Mot. at 17-18. IS argues that SellerBid was a bona fide purchaser Ronald's rights in the parent-patent applications [redacted]. *Id.* This argument fails for a number of reasons.

First, to be considered a bona fide purchaser under § 261, a party must be a subsequent purchaser for "valuable consideration." The requirement of "valuable consideration" in 35 U.S.C. § 261 is more than a formality, and requires that the subsequent purchaser be "more than a donee or other gratuitous transferee." *FilmTec Corp*, 939 F.2d at 1574. IS cannot show that Ronald received more than "the proverbial peppercorn" for his assignment of the parent-patent applications. *See supra* Section V.B.

Next, to be considered a bona fide purchaser under § 261, a party must purchase rights to an invention "without notice" of any previous assignment of such rights. "Notice" under § 261 includes actual, constructive, and inquiry notice. *Bd. of Trustees*, 583 F.3d at 843. IS maintains that SellerBid purchased Ronald's rights "without notice" of Ronald's previous assignment to RFMD. Mot. at 18 [redacted]. But Ronald shared his RFMD application with SellerBid's principal and CEO, which included the following statement: [redacted] Ex. 2 at 9. She (and thus SellerBid) had actual notice of the RFMD Agreement.

[redacted]

Even more, after Ronald began working at RFMD, Anne sent [redacted] an email [redacted] Ex. 41 (Aug. 12, 2008 email and attachment). The email was titled [redacted] and contained an attachment with an agreement with similar language and provisions as the RFMD Agreement. *Id.* For instance, the SellerBid employment agreement included the following clause:

[redacted]

*Id.* at 5. Anne sent this draft of SellerBid's employment agreement [redacted] before he signed three of the four contracts purporting to assign his rights in the parent-patent applications. *See supra* Section V.B. It is not credible that these individuals were never aware that Ronald had an invention-assignment provision with his employer. *Id.* at 1 [redacted]

Finally, SellerBid was on at least inquiry notice of Ronald's RFMD Agreement, in light of the "key roles" Ronald played for the company. *See Filmtec Corp.*, 939 F.2d at 1574. IS argues that Ronald "was never an officer or director of SellerBid." Mot. at 18. But a person does not need official titles to play "key roles" in the company. There is no dispute that Ronald co-founded SellerBid with his sister, Ex. 6 at ¶ 10, and was purportedly an inventor on numerous patent applications in SellerBid's patent portfolio. Ronald also helped lead SellerBid's business growth in China. Ex. 8. Ronald's significance to SellerBid cannot be in dispute. Ex. 42 (SellerBid Management Team). As a result, "at a minimum [SellerBid] might be said to be on inquiry notice of any possible rights in [RFMD] as a result of [Ronald's] work at RFMD." *Filmtec Corp.*, 939 F.3d at 1574.

[redacted]

SellerBid had both actual and inquiry notice of Ronald's assignment to RFMD and was not a bona fide purchaser under § 261. The RFMD assignment remains valid and enforceable.

## VII. DISPUTES OF MATERIAL FACT WHETHER SELLERBID TECHNOLOGY LTD. AND/OR CHINA ENTROPY ARE CO-OWNERS OF THE ASSERTED PATENTS

While discovery is ongoing, IS has produced evidence that calls into question whether two entities in China, SellerBid Technology Ltd. and China Entropy, also have ownership rights in the Asserted Patents. Notwithstanding official titles showing Anne as IS' CEO, IS and its predecessor entity (VIS, *f/k/a/* SellerBid) were and continue to be businesses run by the Wang family (*i.e.*, Anne, Ronald, and Ning). Ex. 6 at ¶ 10; Ex. 42; Ex. 43 (April 27, 2008 email); Ex; 44 (May 20, 2008 email). The same is true for SellerBid Technology Ltd. and China Entropy.

SellerBid Technology Ltd. was allegedly formed in [redacted] Ex. 45 [redacted]. When founded, it had an official address in the United States: [redacted]. Ex. 46 at 1 (May 25, 2011 email attachment). This was the same address as SellerBid and VIS. Ex. 24. SellerBid Technology Ltd. listed its company's U.S. telephone number as [redacted]. Ex. 46 at 1. This is the same telephone number held by the sole principal of SellerBid, VIS, and IS. Ex. 47 (May 12, 2005 email). Finally, SellerBid Technology Ltd. listed its U.S. fax number as [redacted] Ex. 46 at 1. This is Ronald's fax number, as well. Ex. 48.

The comingled business ventures extends beyond sharing addresses and telephone/fax numbers. According to its executive summary, the SellerBid Technology Ltd. partnered with [redacted] Ex. 46 at 3. This partnership [redacted] is what Ronald celebrated with the SellerBid, Inc. team in his May 2008 email. Ex. 8. [redacted]

[redacted]

[redacted] Ex. 49 (emphasis added). [redacted] Ex. 45 [redacted] *Id.* [redacted] [redacted]. Ex. 50 [redacted]

Like SellerBid Technology Ltd., China Entropy is a Wang-family business that purports to have rights in the Asserted Patents. [redacted] Ex. 51 [redacted] E-mail discovery revealed a business plan for China Entropy indicating that the company owns the same patents allegedly owned by IS, and describes IS' and/or SellerBid Technology Ltd.'s patent portfolios as owned by China Entropy. *See, e.g.*, Ex. 52 at 3 [redacted]. [redacted] Ex. 53 at [redacted]. [redacted] Ex. 54 [redacted] [redacted] But after HTC pressed for IS to produce the underlying e-mail or origin of the business plan, IS produced an email sent by Ronald to [redacted] a litigation funder for IS. Anne was copied on the e-mail. Ex. 55 (April 30, 2019 email).

[redacted]

The China Entropy business plan is not an isolated document that Anne can just disclaim. [redacted] Ex. 56 (May 31, 2019 email). [redacted]. Ex. 57 (Mar. 6, 2019 email). [redacted] *Id.* [redacted] *Id.* [redacted] *Id.* at 2. *Compare* Ex. 52 at 3[redacted]

And as the Court is aware, HTC has been deprived of the opportunity to examine Anne and Ronald regarding this evidence because it was withheld by IS despite multiple orders from Magistrate Judge Mitchell for production (4:18-cv-474, Dkt. No. 350, 375), and only produced after the witnesses sat for deposition. At a minimum, there is no basis in view of this evidence to determine on summary judgment that IS owns all right, title and interest" in the Asserted Patents. There are genuine disputes of material fact that HTC must have an opportunity to examine Anne and Ronald about and that a trier of fact should hear and consider. .

## VIII. CONCLUSION

For the foregoing reasons, this Court should deny IS' motion for summary judgment that it owns the patents-in-suit and that it has the right to bring suit under 35 U.S.C. § 262. IS does not hold any legal interest in the Asserted Patents. And if it does, IS has failed to join at least three necessary parties to this litigation.

[redacted]

DATED: June 17, 2020

PAUL HASTINGS LLP

By: *Philip Ou*

Yar R. Chaikovsky
yarchaikovsky@paulhastings.com
Philip Ou
philipou@paulhastings.com
Bruce Yen
bruceyen@paulhastings.com
Joshua Yin
joshuayin@paulhastings.com
Benjamin Alred
benjaminalred@paulhastings.com
David M. Fox
davidfox@paulhastings.com

1117 S. California Avenue
Palo Alto, California 94304-1106
Telephone: 1(650) 320-1800
Facsimile: 1(650) 320-1900

Harry L. Gillam, Jr.
TX Bar No. 07921800
GILLAM & SMITH LLP
303 S. Washington Ave.
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
gil@gillamsmithlaw.com

Attorneys for Defendant,
HTC CORPORATION

[redacted]

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. Plaintiff's counsel of record is being served with a true and correct copy of this document via e-mail, in accordance with the Federal Rules of Civil Procedure as this is filing is Under Seal.

*/s/ Philip Ou*
Philip Ou